JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Hassan, Madina

**DEFENDANTS**
University of Pennsylvania Hospital

(b) County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Michael A. Bowman, Esquire
Bowman & Partners LLP
1600 Market Street, Philadelphia, PA 19103   (215)391-4300

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §2000e, et seq.
Brief description of cause:
Racial and Religious Discrimination

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____   DOCKET NUMBER _____

DATE  7/30/14
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRCIT OF PENNSYLVANIA

| | |
|---|---|
| **MADINA HASSAN**<br>5837 Larchwood Avenue<br>Philadelphia, PA 19143<br><br>   Plaintiff<br><br>   v.<br><br>**UNIVERSITY OF<br>PENNSYLVANIA HOSPITAL**<br>3400 Spruce Street<br>Philadelphia, PA 19104<br><br>   Defendant. | :<br>:<br>:<br>:<br>:<br>: **CIVIL ACTION NO.**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT

Plaintiff, Madina Hassan, by and through her undersigned counsel, files this Complaint and hereby avers as follows:

**I. INTRODUCTION**

1. This is a civil action seeking compensatory, punitive and non-pecuniary damages based on racial discrimination and religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII").

**II. PARTIES**

2. Plaintiff Madina Hassan (hereinafter referred to as "Plaintiff") is an African-American, Muslim adult individual who resides at 5837 Larchwood Avenue, Philadelphia, Pa 19143. Plaintiff is a former employee of University of Pennsylvania Hospital.

3. Upon information and belief, Defendant University of Pennsylvania Hospital. (hereinafter referred to as "Defendant") is a Pennsylvania corporation located at 3400 Spruce Street, Philadelphia, Pa 19104

### III. JURISDICTION

4. This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

5. This action has been instituted within ninety (90) days of Plaintiff's receipt of the June 2, 2014 Equal Employment Opportunity Commission's (EEOC) Dismissal Notice and Right to Sue Letters regarding her timely-filed charges of employment discrimination against Defendant. [See Exhibit A]

### IV. VENUE

6. Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) because the Defendant conducts business in this judicial district and because the overwhelmingly majority of relevant facts took place in this judicial district.

### V. FACTS GIVING RISE TO THE ACTION

#### A. Background

7. On or around late 2007, Defendant hired Plaintiff as a Food Service Worker.

8. Plaintiff reported to the Dietitian Manager, Michael Melvin (hereinafter referred to as "Mr. Melvin").

9. As a Food Service Worker, Plaintiff was responsible for the production and distribution of the patient's meals.

#### B. Defendant's Acts of Racial and Religious Discrimination & Disparate Treatment Against Plaintiff

10. Plaintiff is a Muslim woman. As a Muslim woman, Plaintiff wears a religious headdress known as a "kimar".

11. Wearing a kimar is permitted by Defendant's employment policies.

12. On Plaintiff's first day of employment with Defendant, Mr. Melvin approached Plaintiff and required that she only wear "black kimars" in the workplace.

13. Plaintiff reminded Mr. Melvin that there was no requirement that she wear a specific color.

14. Mr. Melvin stated that he was now requiring Plaintiff to match her work uniform.

15. Plaintiff complied with Mr. Melvin's demand.

16. Following the aforementioned incident, Mr. Melvin generally acted with disdain when interacting with Plaintiff.

17. In 2010 Dorinda, of Defendant's Human Resources department ("HR") conducted a meeting with the food service workers.

18. During the aforementioned meeting, Dorinda discussed a specific gelatin product as patients and employees had questioned its contents.

19. Dorinda explained to the group of approximately 12 (twelve) employees that the gelatin product being distributed to the patients was a beef product.

20. Understanding the importance of providing patients with clarity in relation to products contacting pork, as she does not indulge in pork products due to her religion, Plaintiff asked Dorinda if Defendant was sure that the gelatin product did not contain pork.

21. Dorinda responded in the affirmative.

22. At the conclusion of the meeting, there was no further discussion about the product.

23. Approximately two weeks following the meeting with Dorinda, Mr. Melvin, with his supervisor, Carolyn Tobin (hereinafter referred to as "Ms. Tobin") present, told Plaintiff to go to the dry storage room and bring to him the ten-pound box containing the gelatin product.

24. Mr. Melvin then demanded that Plaintiff read the ingredients listed.

25. Mr. Melvin then aggressively stated, "Point out where it says there is pork in the product."

26. At the point where it became obvious that Mr. Melvin's tone was aggressive, Ms. Tobin dismissed herself from the conversation and walked away.

27. Plaintiff responded that she did not see pork as an ingredient.

28. Mr. Melvin continued in his aggressive manner by stating, "The next time you have a problem with my product, you come to me!"

29. The aforementioned exchange was extremely upsetting to Plaintiff, causing her to question why she was being targeted when the question was asked during a group discussion while others were also concerned.

30. Mr. Melvin directly stated, "My problem is not with them, it is with you."

31. At the time of this incident, there were no other Muslim women working within the entire Food Service Department.

32. A few weeks following the exchange, Plaintiff's medical provider stated that she was in need of an EKG.

33. Plaintiff requested the day off given the scheduled EKG.

34. Mr. Melvin refused to grant Plaintiff the time off, stating that Plaintiff was to report to work immediately following the EKG.

35. Plaintiff reported the unfair treatment to HR.

36. Upon conducting an investigation, Defendant found that Mr. Melvin was acting in a discriminatory manner against Plaintiff and ordered him to attend discrimination training.

37. Soon after, Defendant hired another female Muslim employee.

38. On or around June 14, 2013, Plaintiff's son took ill.

39. Upon arrival to work, Plaintiff notified Rose, Plaintiff's supervisor, that she needed to leave work thirty minutes early to take care of her son.

40. Rose approved Plaintiff's request.

41. Thirty minutes prior to when Plaintiff's scheduled to leave, Rose told Plaintiff that she would need to seek approval from Mr. Melvin.

42. Plaintiff expressed her confusion, given Rose had already approved her request; however, she complied with Rose's instructions.

43. When approaching Mr. Melvin, he lashed out angrily at Plaintiff, screaming that she was "inconsiderate" and that her request was "BS."

44. Mr. Melvin further stated that maybe he should also be "inconsiderate" and not permit her to leave to care for her ill son.

45. Mr. Melvin performed this tirade in the presence of Plaintiff's co-workers.

46. After berating and humiliating Plaintiff, Mr. Melvin permitted her to leave.

47. The next day, Plaintiff informed security that she felt uncomfortable and unsafe in her work environment.

48. Security recommended that Plaintiff speak to administration regarding Mr. Melvin's behavior.

49. Plaintiff expressed her concern to Ms. Tobin.

50. Ms. Tobin apologized to Plaintiff and stated that she would investigate the matter.

51. Instead of investigating as promised, Ms. Tobin never again spoke to Plaintiff about the incident.

52. Upon information and belief, Ms. Tobin took no action regarding Plaintiff's complaint.

53. On or around July 29, 2013, Plaintiff randomly received a "final warning" write-up from Mr. Melvin stating that she had provided a patient with "honey nectar" rather than "nectar."

54. The only notice that Plaintiff received in relation to the mix up was another yelling episode from Mr. Melvin.

55. Given the fact that there had been no previous correspondence regarding the matter, Plaintiff reported the write-up to HR.

56. Upon investigation, on or around August 8, 2013, the final warning was nullified and instead characterized as a "coaching."

57. On or around August 8, 2013, Mr. Melvin continued in his abusive tone and behavior against Plaintiff by again yelling at her while she was simply trying to do her job.

58. Plaintiff went directly to Carolyn Keys (hereinafter referred to as "Ms. Keys"), one of her supervisors, stating that she would not continue to deal with Mr. Melvin's abusive behavior.

59. While engaged in the conversation with Ms. Keys, Mr. Melvin walked by and yelled to Plaintiff in a threatening tone, "Are you talking to me?"

60. Plaintiff responded that she was speaking to Ms. Keys.

61. Ms. Keys instructed Plaintiff to go into the locker room in order to separate Plaintiff from Mr. Melvin.

62. Plaintiff waited in the locker room for approximately three to five minutes.

63. When Plaintiff exited the locker room, Mr. Melvin was waiting there for her and immediately began yelling at Plaintiff, among other things, "Don't you ever disrespect me!", while making threatening gestures towards her by putting his finger in her face.

64. Plaintiff, in an extremely devastated state, immediately went to Lidia Corso,(hereinafter referred to as "Ms. Corso") Director of HR, to report Mr. Melvin's behavior.

65. Plaintiff explained to Ms. Corso that she felt unsafe and that no one was protecting her.

66. Plaintiff further explained her reports to Ms. Tobin and how no action was taken to rectify the situation.

67. The meeting with Ms. Corso concluded with her ensuring to Plaintiff that she would investigate the matter

68. Plaintiff left work that day hysterical and in tears.

69. The following day, HR contacted Plaintiff asking if she had heard anything from Ms. Tobin.

70. Plaintiff replied in the negative.

71. Plaintiff was then instructed by HR to contact Ms. Tobin to inform her of the incident from the previous day.

72. After speaking with Ms. Tobin and explaining the incident, Ms. Tobin stated that she would not tolerate this type of behavior by Mr. Melvin.

73. The following day, Ms. Tobin's approach to the situation completely changed.

74. Ms. Tobin questioned Plaintiff, asking, "Well, are you sure you weren't being a little disrespectful?" and "Is it possible that Mr. Melvin just happened to be walking by the locker room at the time you exited?"

75. Ms. Tobin's line of questioning and actions clearly indicated to Plaintiff that Ms. Tobin would not be of any assistance to her.

76. Plaintiff continuously sought the assistance of Defendant and its agents in order to protect her from this abusive and discriminatory environment, yet no action was taken on her behalf.

77. Upon information and belief, Defendant has received numerous complaints from other African-American employees, such as Celeste Nelson, regarding Mr. Melvin's abusive behavior towards them, yet no disciplinary action has been taken against him.

78. Plaintiff has not observed Mr. Melvin speak to any non-African American and/or non-Muslim employees in the same manner as he does to African-American and/or Muslim employees.

### C. Defendant's Failure to Act Caused Plaintiff Emotional Distress

79. Throughout this entire ordeal, Plaintiff's emotional and mental state has suffered severe and detrimental harm.

80. Due to Plaintiff's inability to function in and outside of her place of employment, her primary care physician requested that she see a psychiatrist.

81. Plaintiff psychiatrist diagnosed her with major and severe depression.

82. Plaintiff's depression affected many aspects of daily living, including but not limited to:

    a. Her ability to work;

    b. Her ability to parent her son; and

    c. Her ability to be a loving wife to her husband.